We'll now hear Patterson v. Strippoli, No. 144624. Good afternoon. May I reserve four minutes for rebuttal? That will be granted. Thank you. May it please the Court. My name is Tom Bruno. I'm an attorney. I'm pleased to represent the generation of Alfred Patterson and Deborah Patterson in this claim against Councilman Joseph Strippoli. As our documents and briefs and papers show, this councilman targeted my clients almost from the point in time when they moved in to Lindenboro Borough back in 2004 with constant surveillance and continuing videotaping pictures. And he continued to abuse his authority as a councilman by inserting himself into Lindenpool's process of ordering code violations of the property. Counsel, can you tell us what's in the record that would indicate that he was the cause of the sports equipment ordinance violation citations? Well, I can tell you that certainly in the record, there's the deposition testimony of Alfred Patterson that said that on at least one occasion, I don't get that. The record is 731. Mr. Patterson did testify that he and his daughter were out playing in the basketball hoop on a Sunday, and the following Tuesday is when they got the citation for one of the two basketball violations. Can we focus on that a little bit? Maybe you can make some sense of this for me. Five neighbors weren't cited. He was. That's the basis of your selective enforcement claim, right? What about the other 28 people who received citations for basketball hoops in town? Shouldn't we count them? And how are the five people different from the other 28? Well, these five people were in his neighborhood, also within the purview of Councilman Skrpol. The other people who were cited, first of all, it was other people who were cited as in the first citation that Mr. Patterson received in December of 2011. I think he was the second person since the beginning of the ordinance who was cited. And the following spring, there were additional individuals cited, and they sprang citations of the Pattersons. The record demonstrates that that was after this meeting where the code enforcement officer was threatened by Councilman Skrpol that he would lose his job. He brought him to his house and pointed to the Pattersons' backyard and said, if you don't enforce the code, you know, if you don't enforce violations against the Pattersons, you're going to lose your job the same way the other two code enforcement individuals lost their job. But directing yourself to Judge Chigares' question, most of the hoop citations occurred after the complaint was filed. Isn't that correct? The five outlined in the complaint were not cited, and Patterson was cited. That's correct. But most of the others occurred after the complaint was filed. I believe that is also correct, Judge. And is that appropriate for us to consider in deciding whether there was a denial of equal protection at the time? Well, I think you can consider it. You know, I focused mainly on the five because the five are the ones that we identified for the time, and we have the record testimony. Including the mayors, including the mayors, correct? The mayor wasn't cited. Right. In fact, the mayor was given disparate treatment. He was the sixth one who was identified in our discovery. We had pictures of the mayors who were being held. And code enforcement officer Ford actually saw the children playing in the mayors, and he told the mayor about it and allowed the mayor to take his down. When code enforcement came to our house in April, our hoop was already down, and he acknowledged in his deposition testimony that really we were not in violation, but he gave us a violation notice anyway. And that was all during the five-month period of time where he was – it was after the meeting where he was threatened by Counselor Mr. Foley to give citations, and it was during that five-month period of time where he staked out my client's house and went there at least 11 or 12 different times over a four- or five-month period and took pictures. And, you know, just targeting my clients based upon the intervention and the dominance. Going back to Judge Rendell's question, what's the effect of sort of after – of the evidence of citations after your client – actually after the complaint was filed, should that be considered at all, that evidence that other people got? Were – were cited for the same thing? Well, the fact is that they hadn't been cited before. Well, that's right. And then, you know – So what – One of whom was there for eight years, and she was within about two blocks of this. Her hoop was up for eight years without any issue whatsoever. So my direct question is, what effect does the – would citations issued after the filing of the complaint in this case have on the case? Any at all or – or some value? Is it relevant at all? Well, I don't think it has any relevance with regards to our claim, meaning, you know, the treatment we received before. You know, what they do, what they got cited or not cited. What we can say is the fact that they cited her was really not relevant to the fact that they hadn't been cited for eight years before. You know, and this was a pretext, more or less, to try and use – to get us out of our house. And we have testimony from the neighbor, our next-door neighbor, Mr. Schwartzwalder, who specifically said, when Counselor Minister Polam was bringing around a petition, his purpose was to get us out of our house, to disenfranchise us from this neighborhood. Let me ask you a question on the class of one claim. I mean, part of that has to be that there was no rational basis for – for this treatment. And there are a number of these complaints that were arguably valid. Is that correct? There were a couple of them, and very minimal in terms of being valid. What's your contention as to the baseless claims versus the valid claims having to do with either junk or noise or anything of that kind? Well, see, the fact of the matter is there were a number of times where the code enforcement came out and there were no – he did not write any citations. There were, I believe, a couple of times where there was recycling material on a truck that was in our driveway. This is a blue-collar town, which has other contractors who have equipment and supplies, and they take them home without any problems, you know, having that in their driveway. And we – Well, there's not a lot of evidence of that. I mean, there are certain statements that, you know, half the town – I think the mayor said half the town has junk in the backyards. And I think Mrs. Patterson said that there are a lot of cars, unlicensed cars in driveways. But we don't have a lot of evidence, do we, about other people or other situations that then weren't targeted? Oh, well, we do have – on the record, 5-18 and 5-28, they were uncorrected violations. And during Mr. Patterson's deposition, I believe on July 23, 2013, at the questioning of Mr. Gillespie and Mr. Foreman, they asked Mr. Patterson, they said, oh, there are plenty of people, you know, I can go around and take pictures and show you, you know, who's in violation. He said, oh, when did he happen to be violent? And we believe on Friday. So by that Friday, we submitted pictures starting at the record of 1479 and provided those pictures by the middle of about 14 or 15 houses with things that are in people's yards. And Mrs. Patterson, in her deposition at the record 5-18 and 5-28, testified as to what it is that she saw and asked about and took these pictures along with Mr. Patterson. They just went out that same day after the deposition, went through the neighborhood and took these pictures. Well, what about the fact that the record also reflects what is characterized in the deposition as hundreds of other citations being made for violations of the noise and debris ordinances? Doesn't that demonstrate that the Pattersons were being treated like others when it came to those sorts of violations? I think, first of all, five or six, there were, I think, 11 citations that were unfound. I think about four or five of them were noise violations. About three of them were from Councilman Mr. Holt. The fact that there are other violations in the barroom doesn't affect the targeting and the scrutiny that we have to undergo for a bar home. But you have to show that your clients were treated different from those who are similarly situated. And if the similarly situated are those who the district court described as property owners whose property would lead to attention by law enforcement or code officials, that's the comparators. And if you're comparing the Pattersons to that group, how can you say they're treated differently? We're comparing ourselves to the residents of the borough who are law-abiding citizens. So your contention is those who are similarly situated to your client, that's the universe, are every other property owner who's law-abiding as opposed to other violators? I'd like to know what your definition of similarly situated is for your comparators. Well, we just want to be treated like other people who are out of discretion when individuals come out. We don't want to have a police officer stake out in front of our house or threaten or have a code enforcement officer say, I want you to go there. And if you don't get the violations, your job, you won't have this job. And the man then proceeds to go out there on a four- or five-month period of time in 2012 and takes 11 sets of pictures. There are no violations, by the way, for that. But just, you know, I think one looks like a dumpster, which unfortunately didn't get picked up in time. But none of that related really to the junk, which is another pretext. They keep trying to say they were junk. But in fact, if you take a look at violations, I think only six out of the 23 related at all to anything that could be related to junk or rubbish. Three of them was because it was on the truck. And three, I think they were off the truck in New York that were eventually put back in either a dumpster or removed. So there's not ongoing, in this eight-year period of time, in 2004 and 2012, there's no ongoing enterprise of a junk or a junk shop or anything like that on the premises. What we just had is the personality issue between Counselor Mr. Foley, who was with five different individuals, black man in, you know, marriage with this white woman in his neighborhood. And the effect of what he did by, you know, interfering with the chief of police, who went out there and called him a nuisance, or a pain in the neck, the head code enforcement officer who said he kept coming and coming and he became a nuisance because he wanted enforcement, more enforcement. And Counselor Mr. Foley specifically said in his deposition that he was still not satisfied with what occurred to the Pattersons in terms of whatever violations they were able to receive. Thank you. Thank you, Counsel. We'll hear from your adversary. May it please the Court, I will ask you on behalf of the defendant, Joseph Foley, for fairly obvious reasons, I think Judge Cooper actually had a very good opinion. And for less obvious reasons, it's hard to distill over 1,400 pages of documents, photographs, transcripts, and police reports into a 22-page opinion and hit all the issues the way that Judge Cooper did. And one of the reasons he was able to do that in 22 pages is that of all of the allegations that arise in this complaint after July 26, 2010, only one, the July – September 15, 2012 visit by Code Enforcement Officer Roger Ford was proven in the record to be initiated by Mr. Foley. And in that incident, in that inspection, Mr. Ford concluded that indeed there was junk and debris and rubbish and trash in the yard. And the plaintiffs admitted in their deposition that Mr. Ford's description of the property at that time was accurate, and they admitted that they obeyed the condition. And the citations for that record are on page 34 of our brief. Other than that, what this case is comprised of is pretty much what you just heard. It's comprised of assumptions. If you've read the transcript of Mr. and Mrs. Patterson, I know you do. I asked them repeatedly about each of these instances, and they assumed. For example, Judge Schwartz, you asked about the hoops, and how did you know that it was Mr. Strapoli? And the answer Your Honor received was, well, Mr. Patterson and his daughter were out there playing on a Sunday, and on Tuesday they were sighted. What's that got to do with Mr. Strapoli? Where's the evidence that Mr. Strapoli was anywhere involved in that? That's what the record is full of. The record is full of two and two equaling five. But isn't for juries to draw those inferences rather than for the judge to say it's impossible to draw them? No, ma'am, because… That's what juries do all the time. It's a lot of circumstantial evidence here, and granted, it is circumstantial. But juries, you know, there's very little direct evidence of animus. But I wonder if we can get to the point where it goes to a point where you've got to have something concrete at least. You've got, as Mr. Bruno said, there are 26 allegations in this complaint, completely dating back to July. Well, there is a lot of concrete. There's a lot of concrete in the mayor's testimony. There's a lot of concrete in, is it, Balmard's testimony that points to racial animus and Strapoli's obsession, obsession with these people. Yeah. There's no doubt that these neighbors don't get along. There's no doubt in the… Oh, I mean, I've seen neighbors that don't get along, but this is really a lot more than that. Wouldn't you agree? No, Judge, I wouldn't. Oh, it's just not getting along? I wouldn't agree with that. The reason I wouldn't agree with that is, again, where is the evidence that Mr. Strapoli made all of these calls? You're talking about 10 years, 3,600 and some days, and the best you can come up with is 26 incidents, of which only a few are traced to Mr. Strapoli? Well, let's talk about the sports equipment ordinance. The Pattersons are cited twice. We have evidence to tell us that five in the vicinity were not. What is the rational basis for having cited them and not the five others? And if there is something in the record that would explain that, if you could direct our attention to that. Well, again, I think, Your Honor, if the case was against the borough or against any of these code enforcement officials who actually issued the notices of violation, we might have that discussion. But this case is about Justice Strapoli, and Justice Strapoli is the next door neighbor. He also happens to be a councilman, but he's a councilman. Isn't the borough a defendant? No, sir, it is not. The only defendant before you, Mr. Burnham, is correct. He is suing Justice Strapoli. He is suing him on the Equal Protection and Class of 1. Both stem from the slight of enforcement. Right, and focusing on the Class of 1 claim, which requires a showing that there was without rational basis for the ordinance, for the enforcement action. Assume for the purposes of this question that there's sufficient evidence to infer that Mr. Strapoli was the causal link to those ordinance citations, those two. What is the rational basis for the other five having not been cited at the same time? And then my second question is, what's the difference if they were cited afterwards and, in fact, isn't that evidence that could be used in a negative way towards your client? I suppose you're drawing a difference from post-complaint filings or notices, but I'm going to correct the record. I know some of you are operating on the assumption that Judge Ravendell has a question about, didn't they all happen after the complaint? At page 8 of our brief, we identified that there are actually 59 between August 3, 2011, July 27, 2013, 28 of which, and these are all hoops. We're here for gas bottles. These are all hoops. Twenty-eight occurred before this lawsuit was filed and 31 after. So it's a pretty even balance. I don't know that you can draw a negative inference all the way to judge. But let's carve it, just focusing on that for a minute, what Judge Schwartz is saying. The five people are very similar because they're in the same close vicinity. Maybe you could answer Judge Schwartz's question then as to the five and the Pattersons. Yeah, I can answer that, and I don't think it's fair to assume that this case goes to a jury against Justice McCauley when there's no evidence that Justice McCauley brought any of the charges against anybody for any hoops violations. You have five people, and while it's easy to say most respectfully, Judge, that it's in the vicinity, there's not a single shred of evidence in front of you that it was within eyeshadow, within viewshadow of Judge McCauley. But I think Mr. Hallsworth testified that it was within two or three blocks of the Pattersons' house, and we know from the record that Mr. Strapoli's house is the backyard of the Pattersons'. So a fair inference is it's in the general vicinity, no? Well, general vicinity, but again, if I'm sitting in my backyard and things bother me, or if I'm in my neighborhood, so my blocks of Judge Strapoli is on East Linden, and Pattersons are on East Elm, right? So that is within two or three blocks of Pattersons, it could be two or three blocks further that way. That's not decided anywhere, so while Mr. Strapoli, pretending again as you ask me to do, that he is the genesis of this, of course there's no evidence this way, but I'll pretend that he is, why does he care what's going on four blocks down the road? He's a councilman, right? It's not his neighborhood, it's not his district, it's not being brought to his attention. Does the borough care? Maybe the borough cares. Well, I don't know if that explanation's in the record, is it? No, no, it's not, but again, what you're asking all of us to do is purely speculate on why. Strapoli, there's nothing in the record to say Strapoli had anything to do with it, so to ask me to justify what the borough of enforcement officers did regarding 59 other properties both before and after the complaint has nothing to do with Strapoli. But doesn't the record include testimony from Mrs. Patterson where she said when Mr. Ford arrived at her house to issue one of the, quote, hoop citations, that he purportedly said to her that it was Strapoli who called it in? I mean, that's a piece of evidence. Except that Ford said all along he never had a complaint. The only one in the record that has any evidence directly linking Strapoli is February 15, 2012. But I think back to what Judge Rendell was saying is that there's a disputed fact as to whether that was said, together with the fact that we do have in the record that Councilman Jackson indicated that Mr. Strapoli repeatedly brought to his attention his concerns about how the Pattersons were maintaining their property. So aren't there enough bits of circumstantial evidence in this record that a jury should make the determination as to whether he was the causal connection between the hoops ordinance violation report? No, Councilman Jackson actually said that Strapoli never called him. Strapoli said he called Jackson a few times. Forgive me if I have the who called who, but there was a dialogue concerning the Pattersons' property That's correct. That's absolutely correct. And it was Strapoli saying I called him. And Strapoli also said when Ballmer was the code enforcement liaison, I called him. I think we're on the same page. That's the point. The point is he reached out for his colleagues who had the authority over the code enforcement or the liaison relationship with the code enforcement personnel, and isn't that enough for the jury to decide whether or not Strapoli was the causal connection between the report and the violation notice? No, Judge, because Strapoli, in making that complaint, whether he's a councilman or not a councilman, is simply making a complaint. Well, for the purpose, as I understand it, just so we're not fighting over if there's state action here, it's my understanding that's not being disputed, that he was acting as a state actor. Are you not sticking by that? That was my understanding from the briefs. Even though one might look at this as, of course, they're neighbors. But nobody ever stipulated that we were conceding this was a state actor issue. Judge Cooper, to the extent that he got anything wrong in his opinion, said and recited the hearing case, saying you can be a non-state actor and still be brought in on 1983 for the wrongful act of a state actor. But he said it was conceded that this was unrecognizable. No, no, he said it's not disputed. It was never in the briefs. It was never discussed. It was never discussed. So at the end of the day, Joe Strapoli, I come back to the idea that he, let's pretend he made only 11 of the complaints post-June 20, July 20, 2010. He's a complainant. But that's not how your briefs are. That's not how the brief for us is. As I understand it, and I'm happy to be corrected, but I understood your briefs not to dispute he was wearing the hat of a councilman. Page 17 and 18, I wrote to your Honor, issuance of notices of violation, summonses, and even the undertaking of investigations constitutes official means for action. Mr. Strapoli was never a council liaison for the public enforcement office. He never signed into charge for notices of violation. Are you taking the position in front of us now he's not a state actor? He was in this capacity. He was a neighbor, which I've said repeatedly. Did you appeal that conclusion to this court from the district court, where in the district court it says it wasn't disputed? The district court may have reached that conclusion, but if you read my briefs, I never said anything about it. But isn't that an issue that should have been raised? Yeah, I mean, I suspect that. But I'll read it to you what it did. And I said in here, since plaintiffs have not appealed, he is simply a neighbor living in a residential subdivision who is tired of working and can fill the old junkyard, slash recycling facilities. That's a little vague. That's a little vague to be contesting a legal conclusion, isn't it? Just to say he's a neighbor? Since plaintiffs have not appealed to dismissal of their claims against the Burroughs, I would respectfully suggest that they no longer have any final cause of action based upon the allegations of their complaint. But then you're arguing Monell here. I'm arguing, and I think a specific assembly member got the wrong defendant. I wrote that on page 17, 18 of my brief. But, okay, so I think that's important, but I can still come back to your honest question, Judge Monell's question about the discriminatory. There's no discriminatory effect here. So let's pretend again that Strapoli made the complaints, and that's a huge stretch, and that he was racially motivated. There were two supervening agencies, agents, who jumped into the fray. One was the liaison who he called, the liaison from the council, his colleague. So even if plaintiffs say he was this powerful guy who had all this influence, having power and influence is nothing illegal, and it doesn't necessarily make what you do unconstitutional. But under Eggervary, our case law, if superseding or intervening causes can take away the effect of what Strapoli did, but not if what he has done amounts to either deception or coercion. And the circumstances here would lead you to believe that by his initiating these things, there was specifically a coercive effect, was there not? No, Judge, there wasn't any. Well, I mean, you can say no and I can say yes, but all the more reason wouldn't that be for a jury to decide? No, because the reason Your Honor is saying yes, most respectfully, is that this record is replete with what I said at the outset. Record, assumptions, and two and two equals five, six, or seven. Well, maybe it's the racial animus that creates, and I'm not sure with a class of one situation, whether you look at the rational, is there a rational reason whether you take racial animus into effect, because clearly there is a lot of evidence in this record of racial animus. Sometimes, you know, it's something that you can intuit or it might be inferred. Here, there's a lot of direct evidence of racial animus that has to be taken into account, does it not? I mean, we can't ignore it. Well, no, you can't ignore it. I'm not going to make a judgment. But it doesn't change the fact that it does not create under these facts a cause of action on behalf of the powers. Because there's no suggestion by anyone. In fact, I've asked the powers, do you have an action by any other beef? With anybody else in the court, the answer was no. There's nothing before this court. Yeah, because it all goes back to Stripley, to his having caused these actions. But nobody has suggested, it's not like anywhere before you, that Councilman Jackson, an African-American, had a racial bias against these folks. He's the liaison, right, that was most actively involved. That's in the record. That if there was a call for his report, it went to Jackson. So now, Jackson decides, well, I'm going to send out my guys, I'm going to go to the enforcement. He calls the director of code enforcement, which was hollowed out for a long time. And then there's a decision. And then Fort said it, and Greer said it, they all said it. When we went to the property, we made our own independent determination of whether or not they violated the requirements. Yeah, but they're going to the property. Would you really want people to be coming to the property 15 times in three months? Looking out for stuff? And nobody else got them visited 15 times? I'm sorry, you know, if there are violations that emanate from it, fine. But having them harassed like that, isn't that sufficient? Well, 15 times in three months. I mean, it was 26 times over 10 years. It was 11 times over a couple of years. And again, only one of those was... Well, but after Fort was told that other people had lost their jobs and he might end up the same way, he was there. I mean, three months, he was there a lot. With respect to that, I don't remember that directly. I don't accept your offer. Okay. But Fort was clear that that threat had nothing to do with it. And frankly, as the police law and counsel, Fort's been promoted. So at the end of the day, the final result, the final governmental actors, the liaison and the enforcement officials, who made the decision, made the decision against the parasomes the same way they made it with hundreds of other residents in the borough. They visited them. They gave a notice of violation. They gave the occupational safety condition. They did the basic issues. The end result was the same for everyone. There was no different effect. All right. Thank you, counsel. Thank you. If I may, Judge Adele, you were 100% correct. The number of times at a minimum that Fort was there, because there were at least 11 times over the next few months after that February meeting where he took pictures, and that is contained in the record when he took pictures. He also said he went by where he didn't take pictures. So we know he went by at least 11 times during the next few months just for that property. We also have testimony of Mr. Schwartzfeld, the very next door neighbor, meaning the same fellow who lives right next door on Elm Street, who said he's never seen any problems with the Patterson property. So as many times as counsel Mr. Coley wants to interject himself and try and intervene, but we also have one neighbor whose testimony is on record of not seeing anything differently. But then you have other neighbors. You have another neighbor who wrote letters twice to complain about the property. So I'm not sure that helps. It would take the amount of concern that someone should have. In this case, the only concern shows the unequal treatment of the property and my client had a racial animus that it was involved. Counsel, can I ask you a question? You cited pages 1479 that there were 14 or 15 other houses that there were pictures of. The pictures started 1479. Could you and your colleague agree on the pictures in the record that relate to the Patterson's house and the pictures in the record that relate to other people's houses? I'm not right here. Yeah, within five days or something, send us a letter on page this is not Patterson's, on page this, this is Patterson's, et cetera, et cetera. Thank you. Because it wasn't clear to me. That's fine. Yes, yes. Let me say that in terms of – you mentioned the hoops. There also was another incident when Mr. Patterson said that he didn't have to pay his driver with hard grass, and that's in Part 790, where his neighbor, to one side, did not have to pay their grass that he used for driving, or the neighbor across the street, who uses her grass for a driver, didn't have to pay her with hard surface rocks. So that, in addition to this treatment, shows someone right there, closer than a block or two of the basketball hoops. And the fact that this is, to some extent, a circumstantial case, to some extent it's a direct evidence case, the fact is, there were direct initiation by Strapoli and indirect initiation by Strapoli. And we have Judge Kugler, in his opinion, says, confirms that Jackson was contacted half a dozen times by Strapoli, that Roach was contacted three or four times by Strapoli, that Doherty was contacted six or seven times by Strapoli, and that's contained right in Judge Kugler's opinion. So those are facts that he gleaned from the record. And plus, we believe that Judge Kugler shouldn't have allowed the jury to make these determinations. We believe that the case in the Grand Jury Summary Judgment was an error, and we ask that it be returned to the local court. Thank you. Thank you, counsel. We'll take the case under advisement. Thank you for the excellent briefing and oral argument. And the clerk will adjourn court.